with all governmental regulations and requirements, and specifically all regulations imposed by FERC. When Reunion, Macquarie, and their legal counsel asked specific questions about such compliance, McNeilus and his legal counsel assured Reunion and Macquarie that all necessary regulatory approvals had been obtained.

35. Reunion, Macquarie, and their respective legal counsel spent a considerable amount of time and expense negotiating a draft purchase and sale agreement and related documentation in reliance upon the representations of McNeilus and his legal counsel that McNeilus had acquired all regulatory approvals, including those required from the FERC. Ultimately, months later, McNeilus admitted that the McNeilus Wind Farms were not FERC compliant, and in mid-March 2008, McNeilus retained the law firm of Van Ness Feldman in Washington, D.C., to obtain the necessary FERC approvals for the operation of the McNeilus Wind Farms.

36. This lack of FERC approval made it impossible to finalize the purchase and sale agreement and consummate the sale to Reunion until the necessary approvals were obtained from FERC. So on May 13, 2008, McNeilus agreed that the parties would defer finalizing the purchase and sale agreement until all necessary FERC approvals were obtained. The approvals were not issued, however, until *after* McNeilus had terminated its relationship with Reunion.

37. Another major issue was the continued payment of wind energy production incentives by the State of Minnesota. The qualification for these incentives was essential to the success of the transaction because, without them, the value of the Wind Farms would have been significantly diminished. Despite repeated requests by Reunion, McNeilus and its legal counsel failed to provide sufficient information to Reunion and Macquarie to permit them to confirm that Reunion would be eligible to receive these payments if it purchased the McNeilus Wind Farms.

38. Yet another major issue was the failure of McNeilus to provide critical documents and information essential for Reunion to complete its purchase of the McNeilus Wind Farms. For example, McNeilus failed to provide:

- All of the organizational documents relating to a number of the SPCs;
- Power purchase agreements between the McNeilus Wind Farms and utilities, which, together with Minnesota State incentive payments and federal production tax credits, are the backbone of the economics of the enterprise;
- Interconnection and transmission agreements;
- Land leases;
- Turbine supply agreements and warranty and repair information and records;
- Administrative service agreements;
- Governmental and regulatory approvals;
- Consents from utilities and other third parties; and
- Evidence necessary to clear title defects and liens and encumbrances on property.

39. Another significant issue related to not-for-profit limited liability companies that owned certain wind generation and power transmission assets. Under the Agreement, Reunion and McNeilus agreed to enter into multiple purchase and sales agreements under which Reunion would acquire 100% of the ownership of all 27 SPCs comprising the McNeilus Wind Farms— that is, the companies which held the ownership of the wind power generation facilities and transmission assets. These companies specifically included six not-for-profit entities: GarMar Foundation, Asian Children Support, Inc.; Bangladesh Children, Inc.; Bobilli Blind School Support, Inc.; Burmese Children Support, Inc.; and Salvadoran Children Support, Inc.

40. McNeilus and his legal counsel agreed to provide a step-by-step plan by which Reunion would acquire the interests held by these not-for-profit entities in a manner that would not jeopardize the fundamental standing of the projects and the underlying economics of the McNeilus Wind Farms transaction. Despite numerous requests by Reunion, McNeilus and his legal counsel failed to provide a written plan for the acquisition of the interests held by these not-for-profit entities. As a result, Reunion was missing a key component of the financial and legal structure—the lack of which was a further impediment to Reunion's ability to advance the closing of the transaction.

41. Despite the delays caused by McNeilus' misrepresentations and failure to provide documents and information, Reunion continued to communicate with McNeilus into July 2008, and continued to attempt to move the transaction forward. These communications were frequent and Reunion regularly provided McNeilus with lists of open items ("checklists") that McNeilus and his counsel were to provide. Between January 18 and July 9, 2008, checklists were sent to McNeilus on numerous occasions. In a meeting in Minnesota on March 6, 2008, that was attended by the parties and their respective legal counsel, McNeilus represented and promised to Reunion and Macquarie that he "would not shop the deal to anyone else." In other words, Reunion would continue to be the exclusive buyer of the McNeilus Wind Farms.

42. McNeilus' express agreement that Reunion had an exclusive relationship with McNeilus was confirmed by McNeilus many times. For example, there was a February 11, 2008 meeting with Vestas where McNeilus introduced Reunion as the purchaser of the McNeilus Wind Farms. Thereafter, with McNeilus' full knowledge and consent, Reunion had numerous follow-up meetings, conference calls and communications with Vestas, together with the exchange of technical and operating data regarding the condition of the Wind Farms. McNeilus

and his staff participated in many of these meetings. Furthermore, with McNeilus' specific consent, Reunion negotiated proposals for the provision of service by Vestas for the Wind Farms over the course of the spring and summer, and those discussions are in fact still active to this date.

43. There was a February 12, 2008 meeting with the Southern Minnesota Municipal Power Authority, where McNeilus introduced Reunion as his "partner." There was an April 2, 2008 meeting with R.W. Beck, during which McNeilus again confirmed that Reunion would be purchasing the McNeilus Wind Farms. And on May 6, 2008, McNeilus and Reunion met with Dairyland Cooperative, an electrical utility that purchased power from the McNeilus Wind Farms, during which McNeilus called Reunion his "partner" in the wind power business.

44. Against this factual background, Reunion and Macquarie were shocked when McNeilus advised Reunion in a July 11, 2008 e-mail that he was unilaterally terminating his Agreement for the sale of the McNeilus Wind Farms. The termination was done without any prior indications or notices to Reunion or Macquarie of any kind, and the termination occurred 4 days prior to a July 15, 2008 scheduled meeting among McNeilus, Reunion, and Macquarie in Minneapolis, Minnesota. The stated agenda for this meeting was to discuss the key open points and the path-forward to closing. Subsequent attempts to reestablish negotiations with McNeilus were unsuccessful, and on July 24, 2008, McNeilus publicly announced that he would sell an undetermined portion of the McNeilus Wind Farms to a third party.

45. Reunion and Macquarie reasonably and justifiably relied upon the written and oral promises, undertakings, and representations of McNeilus and his counsel relating to the sale of the McNeilus Wind Farms. In reliance thereon, Reunion and Macquarie devoted substantial resources and management time, as well as incurred out-of-pocket expenses and attorneys' fees

in an effort to consummate the purchase of the McNeilus Wind Farms. Reunion incurred out-of-pocket costs exceeding $180,000, and Macquarie incurred out-of-pocket costs exceeding $600,000. In addition, Reunion and Macquarie have lost fees, future revenues, and profits that exceed—at a minimum—$5,000,000. The exact amount of the damages incurred by Reunion and Macquarie, as the direct and proximate result of the acts and conduct of McNeilus, will be proven at trial.

## CAUSES OF ACTION

### COUNT I—BREACH OF CONTRACT

46. Reunion and Macquarie reallege each and every allegation contained in paragraphs 1-45, inclusive.

47. Reunion and McNeilus entered into the Agreement for the sale of the McNeilus Wind Farms to Reunion. Macquarie is an intended third-party beneficiary of the Agreement. As hereinbefore alleged, the Agreement and later oral and written amendments require McNeilus to:

- Permit Reunion to conduct usual and customary due diligence;
- Provide necessary corporate information;
- Confirm or obtain regulatory approvals, including the approval by FERC;
- Act promptly because "time is of the essence;"
- Cooperate fully with Reunion to consummate the sale; and
- Treat Reunion as the exclusive purchaser.

48. Despite the obligations and undertakings of McNeilus pursuant to the Agreement, McNeilus failed to:

- Permit Reunion to complete its due diligence;
- Provide necessary corporate information;
- Confirm or obtain regulatory approvals, including the approval by FERC;
- Act promptly because "time is of the essence;"
- Cooperate fully with Reunion to consummate the sale; or
- Treat Reunion as the exclusive purchaser.

13

49. The acts and conduct of McNeilus constitute breaches of the Agreement.

50. As a direct and proximate result of McNeilus' breaches of the Agreement, Reunion and Macquarie have been damaged in an amount in excess of $5,800,000, the exact amount of which shall be proven at trial.

### COUNT II—DECLARATORY JUDGMENT

51. Reunion and Macquarie reallege each and every allegation contained in paragraphs 1-50, inclusive.

52. This action for a declaratory judgment is brought pursuant to Minn. Stat. ch. 555.

53. Reunion and McNeilus entered into the Agreement for the sale of the McNeilus Wind Farms to Reunion. Macquarie is an intended third-party beneficiary of the Agreement. As hereinbefore alleged, the Agreement and later oral and written amendments require McNeilus to:

- Permit Reunion to conduct usual and customary due diligence;
- Provide necessary corporate information;
- Confirm or obtain regulatory approvals, including the approval by FERC;
- Act promptly because "time is of the essence;"
- Cooperate fully with Reunion to consummate the sale; and
- Treat Reunion as the exclusive purchaser.

54. Despite the obligations and undertakings of McNeilus pursuant to the Agreement, McNeilus failed to:

- Permit Reunion to complete its due diligence;
- Provide necessary corporate information;
- Confirm or obtain regulatory approvals, including the approval by FERC;
- Act promptly because "time is of the essence;"
- Cooperate fully with Reunion to consummate the sale; or
- Treat Reunion as the exclusive purchaser.

55. Reunion and Macquarie are entitled to an order of this court declaring the rights

and obligations of the parties under the Agreement and a further declaration requiring the performance of McNeilus under the Agreement. As part of the relief, Reunion and Macquarie are entitled to an injunction enjoining the sale of the McNeilus Wind Farms to third parties and an injunction requiring McNeilus to fulfill its obligations under the Agreement.

## COUNT III—INTENTIONAL MISREPRESENTATION

56. Reunion and Macquarie reallege each and every allegation contained in paragraphs 1-55, inclusive.

57. Prior to signing the Agreement and during the period that Reunion and Macquarie were attempting to obtain information from McNeilus for the purpose of completing the purchase of the McNeilus Wind Farms, McNeilus represented and warranted that McNeilus had obtained all necessary federal and state approvals required for the operation of the McNeilus Wind Farms. McNeilus knew at the time these representations were made that McNeilus did not have the approval of FERC, and he did not receive the approvals until July 18, 2008—after he terminated the Agreement with Reunion and Macquarie.

58. The representations regarding FERC approval were knowingly false at the time they were made. The representations related to material facts concerning the McNeilus Wind Farms and were made with the then present intent to induce Reunion and Macquarie to act in reliance upon the representations. Reunion and Macquarie did in fact reasonably and justifiably rely upon the representations of McNeilus. As a direct and proximate result of those representations, Reunion and Macquarie have been damaged in an amount in excess of $5,800,000, the exact amount of which shall be proven at trial.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38.1, Reunion and Macquarie demand a trial by jury on all issues so triable.

WHEREFORE, plaintiffs Reunion and Macquarie pray for the entry of judgment against all defendants, and McNeil in particular, as follows:

1. An award of damages in an amount in excess of $5,800,000, the exact amount of which to be determined at trial, for defendants' breaches of the Agreement;

2. A declaration of this court regarding the rights and obligations of the parties under the Agreement;

3. An award of damages in an amount in excess of $5,800,000, the exact amount of which to be determined at trial, for McNeilus' intentional misrepresentations relating to the sale of the McNeilus Wind Farms;

4. For injunctive relief requiring McNeilus to provide Reunion and Macquarie with all information required for the consummation of the purchase of the McNeilus Wind Farms, as well as injunctive relief enjoining the sale of the McNeilus Wind Farms to any third party;

5. An award of Reunion's and Macquarie's costs and reasonable attorneys' fees;

6. An award of prejudgment interest on all damages awarded; and

7. For such other and further relief as the court may deem just and equitable.

Dated: July 31, 2008

By: s/ Alan L. Kildow
Alan L. Kildow, Bar No. 143133
alan.kildow@dlapiper.com
Sonya R. Braunschweig, Bar No. 290282
sonya.braunschweig@dlapiper.com
DLA PIPER US LLP
90 South Seventh Street, Suite 5100
Minneapolis, MN 55402-4168
Telephone: 612.524.3000
Facsimile: 612.524.3001
alan.kildow@dlapiper.com
sonya.braunschweig@dlapiper.com

Attorneys for Plaintiffs Reunion Power, LLC and Macquarie Capital (USA) Inc.

CHGO1\31247729.1